UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

     v.

JIMMY BELL,

          Defendant

CRIMINAL NO. 3:24-CR-00052

(MEHALCHICK, J.)

**MEMORANDUM**

Before the Court is a motion to suppress filed by Defendant Jimmy Bell ("Bell") on May 15, 2024. (Doc. 40). The motion is fully briefed, and an evidentiary hearing was held on October 15, 2024. (Doc. 46; Doc. 52). Post hearing briefs were filed on December 6, 2024. (Doc. 97; Doc. 98). Bell moves to suppress evidence obtained by the Pennsylvania State Police ("PSP"), claiming the evidence was obtained in violation of Bell's constitutional rights. Specifically, Bell submits that he had an expectation of privacy on the curtilage of his residence and that the search of his home was unlawful. In response, the Government avers that the PSP troopers had a valid court order allowing for entry into the backyard of Bell's residence, that Bell had no reasonable expectation of privacy in the backyard, and that the inevitable discovery doctrine supports denial of the motion to suppress. For the following reasons, Bell's motion to suppress will be **DENIED**. (Doc. 40).

I.   <u>BACKGROUND AND PROCEDURAL HISTORY</u>

On or about May 25, 2023, the PSP intercepted a package at a UPS sort facility in Dauphin County containing 6lbs of methamphetamine and 2lbs of marijuana. (Doc. 46, at 2; Doc. 52, at 1; Doc. 76, at 12-14). Trooper Matthew Schatzmann identified the package as

suspicious. (Doc. 52, at 2). A drug detection K-9 made a positive indication after inspecting the package. (Doc. 52, at 2; Doc. 76, at 15). The package was addressed to "Amanda Warshawsky" at 101 East Breaker St. Apartment B in Olyphant, Pennsylvania. (Doc. 52, at 2; Doc. 76, at 13). Trooper Schatzmann applied for and was granted a search warrant through Pennsylvania Magisterial District Justice 12-3-05 to search the package. (Doc. 52, at 2; Doc. 76, at 15-16). The search revealed the 6lbs of methamphetamine and 2lbs of marijuana. (Doc. 52, at 2; Doc. 76, at 15-16).

Shortly after the discovery of the contraband, Trooper Cody Montz of the Eastern Interdiction Unit/Drug Law Division of the Bureau of Criminal Investigation became involved in the case. (Doc. 76, at 13). Trooper Montz took custody of the package and transported it to the PSP Dunmore Barracks where it was entered into evidence. (Doc. 52, at 2; Doc. 76, at 13). On May 26, 2023, Trooper Montz applied for and was granted a mobile tracking order for the package by Lackawanna County Court of Common Pleas Judge Margaret A. Bisignani Moyle. (Doc. 52, at 3; Doc. 52-1; Doc. 52-2; Doc. 76, at 17-21). The order allowed Trooper Montz to install a mobile tracking device into the package and reseal it in order to track it as it was brought to its final destination. (Doc. 46, at 3). Trooper Montz specifically requested permission to maintain surveillance of the package even when traveling to potential secondary locations. (Govt. Ex. 1.1; Govt. Ex. 1.2). The relevant portion of his affidavit is as follows:

> In the event the parcel after delivery is taken to a vehicle and removed from the immediate area, officers will attempt to maintain surveillance of said parcel identifying a secondary location and additional conspirators. In the event that the package is taken to a secondary location, your affiant requests authorization for officers to enter that secondary location and secure the package and apply for additional search warrant.

(Govt. Ex. 1.1).

Judge Moyle granted Trooper Montz's request and, upon his belief, incorporated his affidavit into her order. (Doc. 76, at 25; Govt. Ex. 1.2).

After the order was granted, PSP troopers installed both the mobile tracker and a controlled sample of methamphetamine into the package. (Doc. 52, at 4; Doc. 76, at 21, 27). An undercover trooper delivered the package to its target destination in Olyphant at 101 East Breaker Street Apartment B. (Doc. 52, at 4; Doc. 76, at 28). PSP troopers surveilled the package as a woman, later identified as Jazmyn Warshawsky ("Warshawsky"), exited the apartment, sat down next to the package, smoked a cigarette, then picked up the package and brought it into the apartment. (Doc. 52, at 4; Doc. 76, at 28-29). After about an hour of surveillance, Warshawsky was observed exiting her apartment with the package and another similar package. (Doc. 52, at 4; Doc. 76, at 28-32). PSP troopers maintained surveillance of Warshawsky as she entered her vehicle and drove toward Scranton. (Doc. 52, at 4 Doc. 76, at 28-32).

Trooper Montz maintained surveillance of the package through the mobile tracking device as PSP troopers followed Warshawsky's car. (Doc. 52, at 5; Doc. 76, at 44). In Scranton, PSP troopers observed Warshawsky park on the 1300 block of Pittston Avenue, exit her car, and then enter the front gate of 1319 Pittston Avenue. (Doc. 52, at 5; Doc. 76, at 32-33). A man then exited from 1319 Pittston Avenue, walked to her vehicle, and removed the additional package. (Doc. 52, at 5; Doc. 76, at 33-34). This man was later identified as Bell. (Doc. 52, at 5; Doc. 76, at 33-34). PSP troopers watched Bell walk back through the walkway towards the rear of 1319 Pittston Avenue. (Doc. 52, at 5; Doc. 76, at 33-34). At this point, Trooper Montz ordered PSP troopers to follow Bell and Warshawsky onto the premises

3

of 1319 Pittston Avenue. (Doc. 52, at 5; Doc. 76, at 34-35). Once in the backyard area of the property, PSP troopers observed the packages in the first-floor apartment through an open door. (Doc. 52, at 2; Doc. 76, at 35, 51-52). Trooper Montz entered into the backyard as Bell and Warshawsky were arrested and taken into custody. (Doc. 52, at 5; Doc. 76, at 35, 51-51). Immediately after securing the residence, Trooper Montz applied for and was granted a search warrant for the first-floor apartment of 1319 Pittston Avenue. (Doc. 52, at 6; Doc. 52-4; Doc. 52-5). The tracked package, the second package, drug paraphernalia, two guns, and other evidence was then seized from the home. (Doc. 52, at 6-7).

The instant motion to suppress was filed by Bell on May 15, 2024. (Doc. 40). A brief in support of the motion was filed by Bell on May 29, 2024. (Doc. 46). The Government filed a brief in opposition to the motion on August 5, 2024. (Doc. 52). An evidentiary hearing was conducted on October 15, 2024. The official hearing transcript was filed on October 16, 2024. (Doc. 76). Post hearing briefs were filed by both parties on December 6, 2024. (Doc. 97; Doc. 98). Neither party has elected to file a reply brief. Accordingly, the motion is ripe for disposition.

## II. LEGAL STANDARD

The Fourth Amendment protects against unlawful searches and seizures. U.S. CONST. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002). "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, (1983)).

4

Evidence directly derived from an unlawful search or seizure may be excluded from a criminal trial. *See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963). The Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231, (2011). Accordingly, when a criminal defendant believes his Fourth Amendment rights have been violated, he "may move to suppress evidence in the court where trial will occur" under Federal Rule of Criminal Procedure 41(h). Federal Rule of Criminal Procedure 12 requires suppression motions to be made prior to trial. Fed. R. Crim. P. 12(b)(3)(C). On a motion to suppress, the movant has the burden of establishing his Fourth Amendment rights against search and seizure were violated. *Simmons v. United States*, 390 U.S. 377, 389–90 (1968). Meanwhile, the government "bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). The relevant burden of proof is "by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). Importantly, however, the Supreme Court has suggested that exclusion is not a necessary consequence of a Fourth Amendment violation in every case. *See United States v. Leon*, 468 U.S. 897, 905-06 (1984).

"In deciding a motion to suppress, the trial judge, as the fact finder, determines the credibility of the witnesses and the weight to be given to the evidence." *United States v. Moye*, 722 F.Supp.3d 506, 511 (M.D. Pa. 2024) "The court can accept or reject a witness's testimony, assessing credibility on the following factors: demeanor and manner on the stand, ability to accurately recollect, impact of the outcome on the witness, whether the testimony supports or contradicts other evidence, and whether the testimony 'withstands a common sense test of

reason and logic.'" *Moye*, 722 F.Supp.3d at 511 (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)).

## III. DISCUSSION

As a general rule, in a suppression motion, the burden of proof is on the defendant seeking to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) However, "the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005). Here, the Government has offered compelling evidence supporting that the PSP trooper's actions were reasonable under the Fourth Amendment on May 26, 2023, sufficient to defeat Bell's motion. First, it is undeniable that the PSP troopers acted pursuant to an order from the Lackawanna Court of County Pleas which permitted them to track one of the packages at issue. Second, Bell did not have a reasonable expectation of privacy in his backyard, where the PSP troopers spotted the package in Bell's first-floor apartment through an open door. (Doc. 97, at 17-30). Third, even if there had been a Fourth Amendment violation in this case, the inevitable discovery rule renders suppression unnecessary. (Doc. 97, at 17). Bell's motion will therefore be denied. (Doc. 40).

### A. THE PSP TROOPERS HAD AUTHORITY TO ENTER BELL'S APARTMENT COMPLEX

The record reflects that the PSP troopers had legal authority to enter the backyard and first-floor apartment of 1319 Pittston Avenue pursuant to a court order issued by the Lackawanna County Court of Common Pleas on May 26, 2023 authorizing the installation and use of a mobile tracking device into one of the packages at issue, which was known to contain illegal substances. (Doc. 97, at 18; Govt. Ex. 1.1; Govt. Ex. 1.2). As Trooper Montz

6

testified, the order was understood to permit physical surveillance of the package as well as GPS monitoring of the signal received by the mobile tracking device. (Doc. 76, at 44). In his Affidavit in Support for Order Authorizing the Installation and Use of a Mobile Tracking Device, Trooper Montz specifically anticipated a situation in which the package may be brought to a secondary location and thus he sought authorization to enter such location.[1] (Doc. 52-1; Govt. Ex. 1.1, ¶ 12). The order, which the PSP troopers understood to incorporate Trooper Montz's Affidavit, provided that "monitoring need not cease but may continue uninterrupted even if the tracking device is moved within any area protected by a reasonable expectation of privacy." (Govt. Ex. 1.2, ¶ 8). Further, as Trooper Montz explained, the anticipatory search warrant of the secondary location was triggered upon the delivery of the package to 1319 Pittston Avenue, as "once the original recipient of the parcel delivers it to a secondary address, that's a felony delivery for the narcotics. So the triggering effect now is a secondary felony being committed in [PSP Troopers'] presence. Therefore, that triggering effect would now be the secondary location triggering effect to secure it." (Doc. 76, at 49).

---

[1] In his affidavit, Trooper Montz stated:

In the event the parcel after delivery is taken to a vehicle and removed from the immediate area, officers will attempt to maintain surveillance of said parcel identifying a secondary location and additional conspirators. In the event that the package is taken to a secondary location, your affiant requests authorization for officers to enter that secondary location and secure the package and apply for additional search warrant.

(Doc. 52-1, ¶ 12).

Bell asserts that the PSP troopers' entry was "done in direct contraction to the authority given to the Troopers in the warrant they obtained." (Doc. 98, at 9). However, Bell fails to explain how the order was deficient or argue that the PSP troopers lacked probable cause. (Doc. 98, at 10). Instead, he claims:

> [T]he reason for [the warrant and the surveillance device] is to provide law enforcement with the ability to know when the target package is opened, likely to alert law enforcement that the evidence is being accessed and could potentially be destroyed creating the exigent circumstance potentially eliminating their need for a warrant. However, this never happened in this case and yet Trooper Montz still gave the "takedown order" to enter onto Mr. Bell's property and ultimately into his home.

(Doc. 98, at 11).

This description of the order and its purpose contradicts Trooper Montz's testimony, the language of the order, and Trooper Montz's affidavit. (Doc. 76; Govt. Ex. 1.1; Govt. Ex. 1.2). As Trooper Montz explained during the suppression hearing, "even if the tracking device [was] moved within any area protected by a reasonable expectation of privacy," pursuant to the order, the PSP troopers reasonably believed they could continue their surveillance of the packages. (Doc. 76, at 57; Govt. Ex. 1.1). In monitoring packages that enter buildings such as 1319 Pittston Avenue, Trooper Montz made clear that law enforcement typically physically follow the package because "it's physically impossible to maintain surveillance on the parcels as they go into the back area." Further, in this case, Trooper Montz "did not want to lose that physical surveillance," as "being that this is a secondary location, [he] was confident this would be the final destination for those packages." (Doc. 76, at 34).

In considering whether the PSP troopers acted reasonably in executing the order on May 26, 2023, the Court must use a totality of the circumstances approach to evaluate the objective reasonableness from the PSP troopers' perspective. *Santini v. Fuentes*, 795 F.3d 410,

417 (3d Cir. 2015) (citing *Maryland v. Garrison*, 480 U.S. 79, 85 (1987)); *see also United States v. Loy*, 191 F.3d 360, 371 (3d Cir. 1999) (upholding the denial of a motion to suppress where law enforcement reasonably relied on a warrant when conducting a search without probable cause). Considering the testimony of Trooper Montz, a law enforcement officer with nearly a decade of experience, along with the order and affidavit in the record, the Court finds that the PSP troopers reasonably relied on the order when pursuing the packages on May 26, 2023. (Govt. Ex. 1.1; Govt. Ex. 1.2). Accordingly, the Court finds Bell did not suffer a Fourth Amendment violation when the PSP troopers followed him and the packages onto the premises of 1319 Pittston Avenue.

B. BELL DID NOT HAVE A REASONABLE EXPECTATION OF PRIVACY IN HIS BACKYARD AREA

Even if the PSP troopers' understanding of the order was unreasonable, Bell did not have a reasonable expectation of privacy in his backyard, where the PSP troopers ultimately observed and apprehended Bell and the packages. (Govt. Ex. 3.3-3.5). The Government asserts that Bell had no reasonable expectation of privacy in his backyard because "it is a common area shared by both tenants of the building and visible to neighbors." (Doc. 52, at 14; Doc. 98, at 22-23). Bell disagrees, maintaining that the backyard of his apartment building is curtilage that directly surrounds his home in which he had a reasonable expectation of privacy. (Doc. 97, at 3). As Bell sees it, the PSP troopers violated his rights both under the Fourth Amendment and the Pennsylvania Constitution when they did so. (Doc. 97, at 2). The record before this Court and longstanding precedent does not support this conclusion.

Curtilage, or "[t]he area 'immediately surrounding and associated with the home'" is considered to be apart of the home for Fourth Amendment purposes. *Florida v. Jardines*, 569

U.S. 1, 1 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984). To determine whether an area is within the curtilage of the home, courts look to four factors. *United States v. Dunn*, 480 U.S. 294, 301 (1987); *see also United States v. Ortiz*, 483 F. App'x 712 (3d Cir. 2012). These factors include the "proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. The factors are useful analytical tools, not a formula to be mechanically applied. *United States v. Alvarez*, No. 3:CR-22-263, 2024 WL 4278281, at *3 (M.D. Pa. Sept. 24, 2024) (quoting *Dunn*, 480 U.S. at 301); *see also Moye*, 722 F. Supp. 3d at 514. These factors may be used to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. In cases implicating apartments, especially those in "city setting[s]," the Third Circuit has concluded that the *Dunn* factors may be "less determinative." *United States v. Benish*, 5 F.3d 20, 24 (3d Cir. 1993) (quoting *United States v. Acosta*, 965 F.2d 1248, 1256 (3d Cir. 1992)). Consideration of the *Dunn* factors in this case supports that the backyard of 1319 Pittston Avenue does not fall under the umbrella of Bell's home, and he did not have a reasonable expectation of privacy therein.

The Court first turns to proximity of the area claimed to be curtilage to the home and whether the area is included within an enclosure surrounding the home. *Dunn*, 480 U.S. at 301. Consideration of these two factors may weigh in favor the backyard being curtilage. The backyard was very close to the home and enclosed by the same metal gate as the property. *See Dunn*, 480 U.S. at 302 (looking to whether property was enclosed by the same fence as the

home when determining whether it was curtilage). However, the weight of these factors is diminished because Bell's dwelling is an apartment and the backyard is a shared common area. *See Acosta*, 965 F.2d at 1256; *see also United States v. Romano*, 388 F. Supp. 101, 104 & n.5 (E.D. Pa.1975) ("The concept of curtilage has been significantly modified when applied to a multiple dwelling," or an apartment building). Courts in this Circuit have found that in multi-tenant buildings where all tenants enjoy access to its backyard, each tenant's reasonable expectation of privacy is reasonably diminished there. *See Moye*, 722 F. Supp. 3d at 516.

An analysis of the remaining *Dunn* factors further supports that the backyard space of Bell's apartment is not curtilage. Turning next to nature and use, the record reflects that the backyard was used as a walkway for tenants and an entry space to Bell's apartment that was used not only by both him and his neighbor, but their guests, mail persons, workers, and the landlord. (Doc. 76, at 93-97). Such uses have "no relation" to the "'intimate activities associated with domestic life and the privacies of the home,' and thus, cannot be classified as the curtilage of the first-floor apartment." *See Moye*, 722 F. Supp. 3d at 516 (quoting *Dunn*, 480 U.S. at n.4). The backyard did not exist solely for Bell's enjoyment, but, as his neighbor testified, could be used by "anybody." (Doc. 76, at 90, 93-95). Bell's neighbor testified that "the backyard is a common area *for all tenants* of the building and the owner of the building." (emphasis added) (Doc. 97, at 24; Doc. 76, at 97). This considered, very few measures were taken to block the backyard from view of neighbors and passersby, who could see inside through the chain link fence surrounding it and access it to get to the entryways of the apartments. (Doc. 97, at 25). Lastly, the backyard also contained a small garage which Bell did not even have access to. (Doc. 76, at 91). Taken together, the remaining *Dunn* factors thus

11

support the Government's conclusion that the backyard of 1319 Pittston Avenue cannot be considered to be an extension of Bell's home.

Given the backyard is not the curtilage of Bell's home, the observations made there by the PSP troopers were not unlawful. Their plain sight observations of the packages through the open door of the first-floor residence justify their entry into Bell's apartment and his arrest. (Doc. 76, at 35, 51-52). As courts in this Circuit have previously recognized, "it is not unlawful for officers outside the curtilage to observe what occurs thereon." *United States v. Chun Yen Chiu*, 857 F. Supp. 353, 359 (D.N.J. 1993). Accordingly, this Court finds that the PSP troopers did not violate Bell's Fourth Amendment rights on May 26, 2023, at 1319 Pittston Avenue, and Bell's motion to suppress is properly denied on this basis.

C. THE INEVITABLE DISCOVERY RULE RENDERS SUPPRESSION UNNECESSARY

Finally, even if the Court were to find that the PSP troopers' reliance on the order was unreasonable, and that the backyard of Bell's apartment building was a part of the curtilage of his home, the exclusionary rule would not be appropriate here, as the inevitable discovery rule squarely applies. "[I]f the prosecution can establish by a preponderance of the evidence that information ultimately or inevitably would have been discovered by lawful means...then the deterrence rationale has so little basis that the evidence should be received." *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998); *see also United States v. Gilliam*, No. 3:17-CR-258, 2020 WL 4570060, at *21 (M.D. Pa. Aug. 7, 2020). Under the rule, even improperly seized evidence may be admitted if the Government can provide its discovery was inevitable by a preponderance of the evidence. *United States v. Muldrow*, No. CR 20-14, 2020 WL 6445952, at *12 (E.D. Pa. Nov. 3, 2020). "The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule." *Nix v. Williams*,

12

467 U.S. 431, 459 n.4 (1984). As reasoned by the Supreme Court "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Nix*, 467 U.S. at 447. Thus, courts routinely determine suppression is not warranted when the evidence in question would have been inevitably discovered.

The preponderance of the evidence in this case supports application of the inevitable discovery rule. Through the monitoring ordered by the Lackawanna County Court of Common Pleas, the discovery of the packages at Bell's residence was inevitable, as there was data situating the packages at the residence, and physical surveillance of the packages bring brought to the residence. (Govt. Ex. 1.1; Govt. Ex. 1.2). Both Trooper Montz's affidavit and the order support this conclusion. (Govt. Ex. 1.1-1.2). The PSP troopers also had lawfully observed Bell retrieve the packages and could have easily identified him using his address. This all considered, the inevitable discovery rule applies in this case, rending suppression unnecessary. *See Muldrow*, 2020 WL 6445952, at *12 (applying the inevitable discovery rule to deny a motion to suppress). Again, Bell's motion to suppress is properly denied on this basis.

**IV. CONCLUSION**

Based on the foregoing, Mr. Bell's motion to suppress is **DENIED**. (Doc. 40). An appropriate Order follows.

Dated: February 4, 2025                          *s/ Karoline Mehalchick*
                                                 **KAROLINE MEHALCHICK**
                                                 **United States District Judge**

14